2020 IL App (1st) 180819-U

No. 1-18-0819

Order filed November 10, 2020.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 19485 |
| | ) | |
| GENO PAGET, | ) | The Honorable |
| | ) | Joseph M. Claps, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for first degree murder is affirmed over his challenge to the sufficiency of the evidence that he engaged in a common criminal design with an unidentified shooter, or shared the shooter's intent, and was legally accountable for the shooter's actions.

¶ 2    Following a bench trial, defendant Geno Paget was found guilty of first degree murder and sentenced to 47 years' imprisonment. On appeal, defendant contends the State failed to prove his

accountability for first degree murder where the evidence did not establish he shared the intent or criminal design of the unidentified shooter. We affirm.

¶ 3 Defendant was charged with one count of first degree intentional murder, one count of first degree strong probability murder, six counts of first degree felony murder, two counts of vehicular invasion, and one count each of armed robbery, attempt armed robbery, burglary, and aggravated vehicular hijacking. Relevant here, the intentional first degree murder count (720 ILCS 5/9-1(a)(1) (West 2014)) alleged he, without lawful justification, intentionally or knowingly shot and killed Paul Pyron while armed with a firearm. As defendant only challenges the evidence supporting his accountability for murder, we recite only those facts necessary to decide this appeal.

¶ 4 Patrick Anderson testified he sold marijuana in May 2014, and, on May 27, 2014, he received a phone call from a "D-man," whom he knew from school and whose phone number he recognized. He then received a second phone call from a number he did not recognize with area code 312 (the 312 number). Anderson answered this call and spoke to a man, and agreed to sell him seven grams of marijuana for $100. The man told Anderson to meet him at 79th Street and South Damen Avenue to complete the sale.

¶ 5 Anderson and his friend, Paul Pyron, left Pyron's house and drove a Ford Expedition to 79th and Damen. On the way, Anderson called the 312 number and spoke to the man, who told Anderson to go to 80th Street and South Oakley Avenue instead of 79th and Damen. Anderson and Pyron arrived at 80th and Oakley and, as they drove southbound on Oakley, Anderson saw an African-American man wearing a black T-shirt walking towards 80th Street on Oakley. Anderson called the 312 number again and saw the man in the black T-shirt answer a cell phone.

¶ 6    Anderson pulled up to a stop sign at the intersection of 80th and Oakley. Pyron was in the front passenger seat. The man, whom Anderson identified in court as defendant, was waiting at 80th and Oakley, and approached the driver's side of the vehicle, "[c]lose enough to reach." Anderson recognized defendant's voice as the same person he had been speaking to on the phone earlier. Anderson gave defendant seven grams of marijuana. He did not ask defendant for money and defendant did not give him any.

¶ 7    The shooter then approached the front driver's side of Anderson's vehicle and spoke to defendant, but Anderson could not hear what they said.[1] Defendant entered the vehicle on the rear passenger side, and the shooter entered on the rear driver's side. Inside the vehicle, defendant and the shooter talked about the marijuana, and defendant said "he didn't have the money" and "[h]e was going to his grandmother's house to get the money." Defendant exited the vehicle "like he was going to get it" and "went right towards the house that was there." The shooter exited the vehicle as well. Defendant returned approximately a minute later and talked to the shooter outside the vehicle. Pyron said to Anderson, "[I]t don't feel right."

¶ 8    Defendant opened the front passenger door of the vehicle and the shooter appeared in the doorway. Defendant held the door open, and the shooter stood next to him. The shooter said, "[Y]ou all know what this is." Defendant and the shooter did not demand anything, but Anderson believed they meant "it was a robbery." Anderson opened the front driver's side door, "[p]ulled Pyron over the seat," and ran across the street. He heard a gunshot behind him, turned around, and

---

[1]For clarity, we refer to this second man as "the shooter" because defendant does not contest the second man shot and killed Pyron.

saw the shooter standing in front of the vehicle, pointing a gun at him. He did not see defendant, and was not sure where Pyron was.

¶ 9 Anderson ran through several yards and to the front of a house. The Expedition, defendant, and the shooter were gone. Anderson saw Pyron in the street, gasping for air. There was blood on his shirt, and Anderson saw a wound to Pyron's chest.

¶ 10 Anderson had two felony convictions from 2014 and spent 42 months in prison; he was on parole or mandatory supervised release at the time of trial.

¶ 11 The State introduced into evidence a video recording from a surveillance camera in the area of 80th and Oakley and had Anderson narrate portions of it. This video depicts defendant, whom Anderson identified, standing at the corner of 80th and Oakley. Anderson identified the black Ford Expedition he was driving, which stops on 80th Street at the intersection with Oakley. Approximately 10 seconds after Anderson's vehicle arrives, a second individual approaches the driver's side of the vehicle from northbound on Oakley. This person's shoes can be seen just to the right of defendant's shoes.

¶ 12 Approximately one minute later, Anderson moves the Expedition slightly; he testified he was "parking it" because defendant "said he was going to get the money and told [Anderson] to pull over." Approximately four minutes after that, Anderson runs away from and looks back toward the vehicle; he testified he was "confronting the shooter" at this point. Pyron, whom Anderson identified, falls to the ground on 80th Street. Shoes are visible near the vehicle, and then the vehicle drives away southbound on Oakley.

¶ 13 On cross-examination, Anderson testified "D-man" told him "this other person" would be calling him as well. Anderson also testified "D-man" put him in touch with the person Anderson

"believe[d] to be [Pyron's] killer." Anderson spoke to that person on the phone several times that night, and the voice was the same every time. Anderson had never seen defendant before and did not know who he was. When Anderson gave defendant the marijuana, defendant did not show any money or give Anderson any money.

¶ 14    Before the grand jury, Anderson testified "the buyer" said the money was at his grandmother's house, and pointed to the house they were "sitting right in front of." He told the grand jury Pyron said, "[T]his doesn't feel right," and Anderson "asked the guy whether they were going to buy the weed or not." Anderson told the grand jury defendant and the shooter then exited the vehicle, and "the buyer," who had been in the rear passenger seat, opened the front passenger door.

¶ 15    At trial, Anderson testified "the buyer" was behind the other person when the other person said, "[Y]ou know what this is." Anderson was scared. He did not see defendant after that point, and he never saw a gun in defendant's hand.

¶ 16    The State moved Anderson's cell phone records into evidence. These recordings indicate there were seven phone calls between Anderson's cell phone and the 312 number between 10:43 p.m. and 11:16 p.m. on May 27, 2014.

¶ 17    Robert Richmond testified he lived in the area. He was in his garage when he heard a gunshot. He saw a man in red running away, and then a man in a black T-shirt running south on Oakley.

¶ 18    The parties stipulated Dr. Steven White, an assistant medical examiner for the Cook County Medical Examiner's office, performed an autopsy of Pyron on May 28, 2014, and determined the cause of his death was a gunshot wound to the chest, and the manner of death was homicide.

¶ 19    Chicago police forensic investigator Brian Smith testified police recovered the Expedition, but did not attempt to obtain fingerprints from it, because the interior and exterior of the vehicle had been saturated with rainwater.

¶ 20    The parties stipulated that DNA samples taken from the doors of the Expedition were not suitable for comparison.

¶ 21    Detective Patrick Thelen testified he and his partner were assigned to investigate a homicide on the 2300 block of West 80th Street on May 27, 2014. Two houses across the street from each other on that block had home exterior surveillance cameras. Anderson identified defendant in a photo array and a lineup. Thelen testified defendant was arrested.

¶ 22    Chicago police officer Elmore Metcalf testified he downloaded video recordings from two home surveillance systems located on the 2300 block of West 80th Street. Both surveillance systems were working properly and made video recordings of 80th and Oakley on that date.

¶ 23    Defendant moved for a directed finding, arguing that even if the court believed Anderson's account, the evidence was insufficient to establish defendant was complicit in Pyron's death. The State responded defendant and the shooter had a "common scheme or design" to "rip off the marijuana dealer," *i.e.*, Anderson, and that defendant was, therefore, "accountable *** for everything that arose from that action." The court denied defendant's motion.

¶ 24    The parties stipulated Sprint provided service to the 312 number, and that the account for the 312 number was attached to a "Sam Doe" who lived on South Ashland Avenue in Chicago. The account was active from May 26 through May 28, 2014.

¶ 25    The court found defendant guilty of intentional first degree murder, strong probability first degree murder, and four counts of felony murder based on armed robbery, attempt armed robbery,

aggravated vehicular hijacking, and burglary. Defendant was also found guilty of armed robbery, attempt armed robbery, one count of vehicular invasion, aggravated vehicular hijacking, and burglary. The court acquitted defendant of one count of vehicular invasion and both felony murder counts based on vehicular invasion.

¶ 26    Defendant filed a motion for a new trial, arguing, in relevant part, the State failed to establish his accountability for the actions of "the individual alleged to have committed the vehicular invasion and robbery of Patrick Anderson and Paul Pyron." The trial court denied this motion.

¶ 27    The court merged all counts into the first degree intentional murder count (720 ILCS 5/9-1(a)(1) (West 2014)) and sentenced defendant to 47 years' imprisonment. Defendant filed a motion to reconsider sentence, which was denied.

¶ 28    On appeal, defendant only challenges his conviction for first degree murder. Specifically, defendant contends the State failed to prove his legal accountability for first degree murder where the evidence was insufficient to establish he shared the intent or criminal design of the unidentified shooter.

¶ 29    When a defendant challenges the sufficiency of the evidence, we examine whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the charged crimes beyond a reasonable doubt. *People v. Pizarro*, 2020 IL App (1st) 170651, ¶ 29. We do not retry a defendant, and we will not substitute our judgment for that of the trier of fact with respect to the weight of the evidence or the credibility of witnesses. *People v. Sutherland*, 223 Ill.2d 187, 242 (2006). "The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and

reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact." (Internal citations omitted.) *Id.* We will not reverse a conviction unless the evidence is so improbable, unreasonable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011). This standard applies when a defendant challenges the sufficiency of the evidence of his legal accountability. See *People v. Doolan*, 2016 IL App (1st) 141780, ¶ 40.

¶ 30     A defendant commits first degree murder when he kills an individual without lawful justification and "either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another." [2] 720 ILCS 5/9-1(a)(1) (West 2014).

¶ 31     The State sought to hold defendant liable for Pyron's murder under a theory he was legally accountable for the shooter's actions. A defendant is legally accountable for the conduct of another when, either before or during the commission of an offense, and with the intent to promote or facilitate its commission, he solicits, aids, abets, agrees, or attempts to aid the other person in the planning or commission of the offense. 720 ILCS 5/5-2(c) (West 2014); *People v. Fernandez*, 2014 IL 115527, ¶ 13. To prove a defendant's accountability, the State may present evidence showing either (1) the defendant shared the criminal intent of the principal, or (2) that there was a common criminal plan or design. *Fernandez*, 2014 IL 115527, ¶ 21. Shared intent and common

---

[2] In addressing the accountability issue, the parties' briefs cite the felony murder statute (720 ILCS 5/9-1(a)(3) (West 2014)). But the trial court did not sentence defendant on the felony murder counts, only on the intentional murder count (720 ILCS 5/9-1(a)(1) (West 2014)). Our "jurisdiction extends only to final judgments and *** there is no final judgment in a criminal case unless a sentence has been imposed." *People v. Relerford*, 2017 IL 121094, ¶ 71. Thus, the unsentenced felony murder counts are not before us. The only count before us is defendant's conviction for first degree intentional murder.

criminal design are separate accountability theories. *Id.* Here, the State argued defendant and the shooter had a "common scheme or design" to "rip off the marijuana dealer."

¶ 32     If two people engage in a common criminal plan or design, any acts in furtherance of that common design committed by one party are considered to be the acts of all parties to the design, and all are equally responsible for the consequences of such acts. *Id.* " 'A conviction under accountability does not require proof of a preconceived plan if the evidence indicates involvement by the accused in the spontaneous acts of the group.' " *People v. Cowart*, 2017 IL App (1st) 113085-B, ¶ 34 (quoting *People v. Cooper*, 194 Ill. 2d 419, 435 (2000)). "Nor is active participation in the offense a prerequisite to guilt by accountability." *People v. Ramos*, 2020 IL App (1st) 170929, ¶ 56. "A defendant may be found guilty under an accountability theory even though the identity of the principal is unknown." *Cowart*, 2017 IL App (1st) 113085-B, ¶ 34.

¶ 33     A common design may be inferred from the surrounding circumstances; words of agreement are not required. *People v. Willis*, 2013 IL App (1st) 110233, ¶ 79. " 'Proof that the defendant was present during the perpetration of the offense, that he fled from the scene, that he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime are all factors that the trier of fact may consider in determining the defendant's legal accountability.' " *People v. Ealy*, 2019 IL App (1st) 161575, ¶ 32 (quoting *People v. Perez*, 189 Ill. 2d 254, 267 (2000)). " '[E]vidence that the defendant voluntarily attached himself to a group bent on illegal acts, with knowledge of its design, also supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another.' " *Doolan*, 2016 IL App (1st) 141780, ¶ 43 (quoting *Perez*, 189 Ill. 2d at 267). "However,

mere presence at the scene of a crime and knowledge that a crime is being committed are insufficient to establish accountability." *People v. Craigen*, 2013 IL App (2d) 111300, ¶ 33.

¶ 34    Viewing the evidence in the light most favorable to the State, we conclude a rational trier of fact could find defendant and the shooter had a common criminal plan or design. Anderson's testimony and the video established defendant and the shooter were physically near each other and communicated verbally during this incident. They approached Anderson's vehicle within 10 seconds of each other and spoke to each other outside the vehicle. They got into the vehicle at the same time and continued talking to each other inside the vehicle. They approached the front passenger door together, and were standing next to each other when the shooter said, "You all know what this is," which Anderson interpreted as an announcement of a robbery. At some point, defendant fled the scene. There was no evidence defendant reported Pyron's murder to the police.[3] These factors support a finding defendant was engaged in a common criminal plan or design with the shooter, and was legally accountable for his actions. See *Ealy*, 2019 IL App (1st) 161575, ¶ 32.

¶ 35    In addition, defendant telephoned Anderson and directed him to a location where defendant and the shooter would be. As noted above, the video shows the shooter arrived at Anderson's vehicle approximately 10 seconds after defendant and stood directly next to him. This evidence supports an inference defendant and the shooter coordinated their actions, and that some degree of planning occurred for them to have been at the same place at the same time. It also suggests the

---

[3]Defendant argues he did not report the murder because he did not want to admit to police he bought marijuana. But a rational factfinder could infer defendant did not report the murder because he was the shooter's accomplice.

shooter knew defendant, because the shooter knew to approach the vehicle defendant was standing near.

¶ 36 Further, defendant told Anderson he would pay $100 for the marijuana but, apparently, did not bring any money to the transaction. This behavior supports an inference defendant never intended to pay Anderson for the marijuana, but instead planned to rob him of it with the shooter's help. The evidence supports a rational conclusion defendant and the shooter were engaged in a common criminal plan or design, and that defendant was, therefore, legally accountable for the shooter's actions. Thus, he was responsible for the consequences of the shooter's actions in furtherance of the common criminal design (*Fernandez*, 2014 IL 115527, ¶ 21) and guilty of first degree murder.

¶ 37 Nevertheless, defendant argues the evidence only established he intended to buy seven grams of marijuana from Anderson, not that he intended to rob Anderson with the shooter. However, to conclude defendant was a bystander coincidentially caught in the middle of a robbery would require us to search for any explanation consistent with innocence and raise it to the level of reasonable doubt. Doing so would be contrary to the law. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 229 (2009). Defendant's argument that "the record is silent about the substance" of his and the shooter's conversations is unpersuasive. Words of agreement are not necessary to prove a common criminal plan or design. *Willis*, 2013 IL App (1st) 110233, ¶ 79. Defendant also claims he fled the scene prior to the shooter firing the gun, but active participation in a crime is not necessary to establish accountability. *Ramos*, 2020 IL App (1st) 170929, ¶ 56. None of these arguments negate the State's proof of defendant's legal accountability under a theory of a common criminal plan or design between him and the shooter.

¶ 38 Finally, the cases defendant cites are distinguishable because they involved situations in which the State failed to prove the defendant was part of a common plan to commit murder itself. See, e.g., *Cowart*, 2017 IL App (1st) 113085-B, ¶ 35 (no evidence of common plan between defendant and partygoers to commit fatal shooting); *People v. Johnson*, 2013 IL App (1st) 122459, ¶ 132 (no evidence of advance planning for defendant to transport shooter to kill victim); *People v. Estrada*, 243 Ill. App. 3d 184, 185 (1993) (no evidence of common plan to commit gang-related shooting). Here, by contrast, the State's theory was, essentially, that defendant was part of a common criminal plan to rob Anderson, not to murder him. Defendant was legally accountable for the robbery and the consequences of any actions in furtherance of that design, including Pyron's death during the robbery. These cases do not warrant reversal of defendant's murder conviction. Accordingly, we affirm defendant's conviction for first degree murder.

¶ 39 For the foregoing reasons, we affirm defendant's conviction for first degree murder.

¶ 40 Affirmed.